**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| HERB HALLMAN CHEVROLET, INC., d.b.a. CHAMPION CHEVROLET, | Case No. 3:22-CV-00447-MMD-CLB |
| Plaintiff, | **ORDER DENYING PLAINTIFFS MOTION FOR SANCTIONS AND GRANTING MOTIONS TO SEAL** |
| v. | [ECF Nos. 52, 53, 60] |
| GENERAL MOTORS LLC, | |
| Defendant. | |

Plaintiff Herb Hallman Chevrolet, Inc., doing business as Champion Chevrolet ("Champion"), filed a motion for sanctions alleging Defendant General Motors LLC ("GM") spoliated evidence. (ECF No. 52.) Champion contemporaneously filed a motion to seal exhibits to the motion for sanctions. (ECF No. 53.) GM filed a response to Champion's motion for sanctions, (ECF No. 59), and contemporaneously filed a motion to seal exhibits to its response. (ECF No. 60.) Champion replied. (ECF No. 61.) For the reasons stated below, the Court denies Champions motion for spoliation sanctions, (ECF No. 52), and grants the motions to seal. (ECF Nos. 53, 60.)

I.    **BACKGROUND**

A.    **Factual Summary**

Champion is a Chevrolet-brand car dealership in Reno, Nevada. (ECF No. 1-1 at 3; ECF No. 21 at 2.) GM manufactures and delivers Chevrolet-brand motor vehicles in the United States through a network of franchised Chevrolet dealers, including Champion. (ECF No. 1-1 at 5, ECF No. 21 at 2.) The parties have a contractual relationship which is set forth in a Dealer Sales and Services Agreement. (*Id.*)

GM allocates vehicles to distribute using the following methodology:

Each GM dealer is assigned an Area or Primary Responsibility ("APR") comprised of census tracts that are closest to the dealer's physical location. To determine a dealer's "expected" sales, GM calculates Chevrolet's market share in a comparison geographic area (typically the

state) for a particular vehicle segment (i.e., luxury sedan) and then multiplies that market share percentage by the total retail motor vehicle registrations in a dealer's APR for that same vehicle segment. The same process is repeated for each vehicle segment in which Chevrolet competes to determine a dealer's "expected" sales. . . . GM evaluates a dealer's sales performance by comparing the dealer's actual retail sales (nationwide) against the number of "expected" sales and that calculation is referred to as the dealer's Retail Sales Index ("RSI").

(ECF No. 59 at 21, n.8.) GM also has a pool of cars known as Strategic Targeted Market Initiative ("STMI") vehicles over which GM has full discretion to distribute. (ECF No. 1-1 at 11, ECF No. 21 at 6.)

Champion represents that, since 2015, it has objected in writing to GM's distribution processes by informing GM that such procedures are harmful to Champion. (ECF No. 52 at 2.) The parties corresponded about Champion's objections and ultimately, on August 25, 2020, Champion sent a preservation letter to GM requesting "a litigation hold regarding GM's allocation and distribution of vehicles in the Region and all related correspondence (both internal and external)." (ECF No. 52-6 at 2.) Specifically, Champion requested:

(i)     all database entries evidencing the allocation of vehicles in the Region;

(ii)    reports regarding allocation of vehicles to dealer(s) in the Region;

(iii)   internal correspondence regarding the allocation and distribution of vehicles, both in general, and to Region dealers; and

(iv)    correspondence between GM personnel and dealer personnel regarding the allocation and distribution of vehicles.

(*Id.*)

On September 15, 2022, Champion filed a complaint alleging that "GM failed to adequately, fairly, non-discriminatorily and reasonably allocate Chevrolet motor vehicles to Champion." (ECF No. 1-1 at 3.) Champion claims "GM's tiered allocation system, and its separate pool of vehicles distributed by GM at its sole discretion, treats Champion unfairly, unreasonably and discriminatorily resulting in a severe deficit in the number and variety of vehicles GM allocates to Champion preventing Champion from meeting

1  customer demand in its market." (*Id.* at 4.)

2  Champion brought four claims. The first two claims allege breach of contract

3  based on GM's inequitable tiered allocation system and STMI allocation processes and

4  subsequent failure to provide Champion with "a mix of models and series in quantities to

5  fulfill its [sales] obligations." (*Id.* at 26-28.) The final two claims allege GM violated

6  Nevada law because the tiered allocation system and STMI allocation processes

7  unlawfully discriminate between Champion and other Nevada Chevrolet Dealers under

8  NRS 482.36388(1) and withhold, reduce, or unreasonably delay without just cause the

9  delivery of new vehicles to Champion. (*Id.* at 28-32.) Champion's complaint requests a

10  judgment against GM "finding that GM's tiered allocation system and STMI allocation

11  processes are unlawful pursuant to NRS 482.36388(2)" and "a permanent injunction

12  requiring GM to rectify its allocation process in Nevada." (ECF No. 1-1 at 33.)

13  **B.  Procedural History**

14  Champion initiated this lawsuit in the Second Judicial District of Nevada. (ECF

15  No. 1-1.) GM removed the case to federal court on October 11, 2022. (ECF No. 1.) On

16  December 19, 2023, Champion filed a motion regarding discovery dispute pursuant to

17  the Court's standing order, (ECF No. 22). (ECF No. 42.) Champion asserted that GM

18  failed to produce documents in response to requests for production ("RFPs") and that

19  the parties were unable to reach a resolution regarding the outstanding requests. (*Id.* at

20  2.) Among other issues, and Champion requested certain allocation reports from

21  January 2018 through October 2019 for all Nevada dealers to satisfy two outstanding

22  RFPs.[1] (*Id.* at 4.) GM had partially complied with the RFPs by producing allocation

23  _____

[1]  The full text of the RFPs are as follows:

24  Request No. 6: All allocation summary reports for each GM dealer in the

25  State for the relevant period to include information showing both
   consensus or standard weekly allocations as well as any discretionary

26  allocation provided to any dealer in the State.

27  Request No. 7: Dealer allocation by dealer, tier, allocation cycle, and
   allocation group showing calculated allocation, controlled allocation, STMI,

28  requested allocation, incremental/turn downs, deliveries, each type of

history reports and weekly order placement results for Nevada Chevrolet dealers for the time period November 2019 through October 2023. (ECF No. 59-3 at 2.) GM describes the records as providing "comprehensive information regarding vehicle allocation and show, among other things, the number of vehicles allocated, available days' supply, in-stock inventory, in-system inventory, total estimated vehicle shipments, and units requested or declined by each Nevada Chevrolet dealer." (*Id.*)

GM responded, arguing the additional data requested, including dealer allocation history reports from January 2018 through October 2019, "would require GM to perform a search of archived data or back up tapes to determine whether such data even exists and/or [] is not necessary for the preparation of an expert report." (ECF No. 43 at 2-3.) GM argued it had already produced extensive data concerning the allocation system, "including: national allocation data of Chevrolet vehicles by model year and allocation group; dealer allocation history reports and dealer order submission reports for Nevada Chevrolet dealers; annual sales performance reviews for Nevada Chevrolet dealers; and sales and availability reports concerning the allocation of new vehicle models." (*Id.* at 4-5.) GM also argued Champion does not explain how the documents are relevant to its claim that GM's tiered allocation system is unlawful. (*Id.*)

On January 4, 2024, the Court held a hearing regarding Champion's motion regarding discovery dispute, (ECF No. 42). (ECF No. 45.) After reviewing the briefing by the parties and discussion at the hearing, the Court granted in part and denied in part Champion's motion. (*Id.*) As to the RFPs relevant to the instant motion for sanctions, the Court denied both requests "for the time being" and ordered counsel for GM "to go back to his client to get specific information regarding the issues with gathering the information from January 2018 to October 2019, where the data is located, how it can be retrieved, the time frame for retrieval and the cost associated with such retrieval." (*Id.*

---

inventory (stock, in transit, etc.), travel rate, and days' supply data used to assign allocation for each dealer in the State and Region.

(ECF No. 42 at 4; ECF No. 42-2 at 2-3.)

at 2.)

After deciding on Champion's motion regarding discovery dispute, the Court ordered the parties to meet and confer regarding the outstanding issues. (*Id.*) At the subsequent status conference regarding the outcome of the meet and confer, the Court found that Champion had leave to file a spoliation motion regarding the information requested in the two outstanding RFPs. (ECF No. 47.)

### C.    Motion for Sanctions

Turning to the motion for sanctions presently before the Court, Champion seeks sanctions against GM for the spoliation of the 2018 and 2019 Dealer Allocation History Reports and Weekly Order Placement Results ("2018/2019 Reports"). (ECF No. 52.) Champion argues that GM was under a duty to preserve the 2018/2019 Reports, the ESI was lost because GM failed to adequately adhere to their litigation hold, and the ESI is irreplaceable. (*Id.* at 10.) Champion argues it is prejudiced by GM's actions because the lost "documents are imperative to displaying the treatment of Champion in comparison to other dealers in the Western Region throughout the Relevant Time Period." (*Id.* at 21.) Therefore, Champion requests "a jury instruction be provided that: (1) GM prepared and had possession at one point of the Western Region's Allocation History and Order Management Reports; (2) GM had a duty to preserve these reports but failed to take reasonable steps to do so; (3) this information was relevant to the claims in this case; and (4) the reports cannot be recovered." (*Id.* at 23.)

In opposition, GM argues there is no spoliation because GM did not have a duty to preserve the 2018/2019 Reports based on the issues Champion raised at the time the ESI could have been preserved. (ECF No. 59 at 1-2.) GM argues it did not intentionally destroy documents and took reasonable steps to preserve ESI by issuing a litigation hold. (*Id.* at 2.) Further, GM argues it has produced "alternate data that provide the information which Champion now claims is missing or, at the very least, provide Champion a basis to test its [] claims" and Champion has not demonstrated prejudice based on the alleged spoliation. (*Id.*)

Champion replied, arguing its complaint did not *exclusively* challenge STMI and the tiered nature of ADS Allocation. (ECF No. 61 at 2.) Rather, Champion characterizes the complaint as "contend[ing] that the volume of vehicles allocated by GM was unfair, and STMI allocation and the tiered-nature of ADS Allocation were factors contributing to the unlawful distribution through GM's system which violate the terms of the parties' contract, and law." (*Id.*)

## II.    DISCUSSION – MOTION FOR SANCTIONS

### A.    Legal Standard

Generally, "[t]here are two sources of authority under which a district court may sanction a party who has despoiled evidence[:]" sanctions under Federal Rule of Civil Procedure 37 and "the inherent power of federal courts to levy sanctions in response to abusive litigation practices." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). However, in situations concerning electronically stored information ("ESI"), the Court may only issue sanctions under Rule 37(e). Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment ("Rule 37(e). . . forecloses reliance on inherent authority or state law to determine when certain measures should be used" in cases concerning the spoliation of ESI); *see Jones v. Riot Hospitality Group, LLC*, 95 F.4th 730, 734-35 (9th Cir. 2024) (applying Rule 37(e) in case concerning spoliation of ESI); *see also Newberry v. Cty of San Bernardino*, 750 Fed.Appx. 534, 537 (9th Cir. 2018) (unpublished) (recognizing limitation placed on courts' inherent authority to sanction parties for spoliation of ESI by the 2015 amendment to Rule 37(e)).

In order to impose Rule 37(e) sanctions, the Court must first evaluate the following criteria: (1) whether the information qualifies as ESI; (2) whether there was a duty to preserve the ESI in the anticipation or conduct of litigation; (3) whether the ESI was lost because a party failed to take reasonable steps to preserve it; and (4) whether the ESI can be restored or replaced through additional discovery. *Lopez v. Cardenas Markets, LLC.*, No. 2:21-cv-01915-JCM-BNW, 2023 WL 3182658, *2 (D. Nev. May 1, 2023). Once those determinations are made, Rule 37(e) permits two categories of

6

sanctions. First, where the district court finds that the loss of information has prejudiced the moving party, the district court may order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, where the district court finds that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the district court may require an adverse evidentiary presumption, dismiss the case, or enter default judgment. Fed. R. Civ. P. 37(e)(2).

In making factual findings to support the imposition of spoliation sanctions, courts in the Ninth Circuit apply a preponderance of the evidence standard. *See Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052-53 (S.D. Cal. 2015) ("the applicable standard of proof for spoliation in the Ninth Circuit appears to be by a preponderance of the evidence"); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1072 (N.D. Cal. 2006) (finding "no Ninth Circuit authority applying the clear and convincing standard to the exercise of the court's inherent authority to impose dismissal or default sanctions, and the Ninth Circuit has not squarely addressed the issue of which standard of proof is appropriate").

### B.    Analysis of Rule 37(e) Threshold Determinations

Before evaluating if sanctions can be imposed under Rule 37(e), the Court must first determine: (1) whether the information qualifies as ESI; (2) whether there was a duty to preserve the ESI in the anticipation or conduct of litigation; (3) whether the ESI was lost because a party failed to take reasonable steps to preserve it; and (4) whether the ESI can be restored or replaced through additional discovery. *Lopez*, 2023 WL 3182658 at *2.

On the first question, whether the information qualifies as ESI, both parties agree that the information in question is ESI. (*See* ECF No. 52 at 10 ("[T]he Dealer Allocation History and Order Management History Reports were ESI within GM's databases. . ."); ECF No. 59 at 12 ("The 2018/2019 Allocation Records are electronically stored information. . .").) The Court now turns the remaining three criteria.

///

1

**1.     Duty to Preserve ESI**

2      As to the first issue, Champion argues GM was under a duty to preserve ESI

3  related to allocation data since "at least 2017." (ECF No. 52 at 10.) Rule 37(e) is based

4  on the common law duty to preserve relevant information when litigation is pending or

5  reasonably foreseeable. Fed. R. Civ. P. 37, Advisory Committee Notes to 2015

6  Amendment ("Rule 37(e) is based on this common-law duty; it does not attempt to

7  create a new duty to preserve."). Whether a party's duty to preserve is "reasonably

8  foreseeable" is evaluated using an objective standard. *Apple Inc. v. Samsung*

9  *Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012) (citing *Micron*

10  *Technology, Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (9th Cir. 2011)). The mere

11  existence of a potential claim or the distant possibility of litigation is not sufficient to

12  trigger a duty to preserve. *Micron Technology*, 645 F.3d at 1320. "The duty to preserve

13  evidence also includes an obligation to identify, locate and maintain, information that is

14  relevant to specific, predictable, and identifiable litigation." *Apple*, 881 F. Supp. 2d at

15  1136 (internal quotation and citation omitted).

16      Champion argues it documented its challenges to GM's allocation distributions

17  and advantages provided to dealerships in Las Vegas and within the Western Region

18  since 2017, including in a series of letters sent to GM by Champion in 2017 and 2018.[2]

19

20  [2]      Throughout its motion, Champion repeatedly references attached exhibits without

21  including a pin cite reference. (*See, e.g.*, ECF No. 52 at 4 ("During this meeting, Champion emphasized that GM's sales performance metrics were leading to inequitable

22  methods of distribution within the Region. *See* Ex. 2.").) Champion's "Exhibit 2" contains 178 pages. (ECF No. 52-2.) Champion is reminded that the Court is not a pig searching

23  for truffles in the forest. *U–Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd.*, Case No. 2:12–CV–00231, 2013 WL 4505800, at *2 (D. Nev. Aug. 21, 2013) (internal citation

24  omitted) ("[T]he Court reminds the parties that the burden of representation lies upon them, and not upon the Court. Whether it is the familiar 'pigs hunting for truffles'

25  metaphor or the 'spaghetti approach,' the idea that the Court will not perform the work of

26  representing the parties is clear."); *Agarwal v. Oregon Mut. Ins. Co.*, Case No. 2:11–cv–01384, 2013 WL 211093 at *3 (D. Nev. Jan. 18, 2013) (internal citation omitted) ("[I]t is

27  not the responsibility of the judiciary to sift through scattered papers in order to

28

(*Id.*) Champion argues they explicitly mentioned Western Region sales reports as well as Champion's individual dealer inventory reports. (*Id.*) Further, Champion provides a copy of an August 2020 letter sent by Champion's counsel to GM requesting GM place a litigation hold on retention of information in anticipation of litigation. (ECF No. 52 at 10; ECF No. 52-6.) Based on the letters, Champion argues GM knew or should have known the relevant time frame of documents to preserve and that any allocation history documents would be directly relevant to any claims Champion made in the future. (ECF No. 52 at 12-13.) Champion argues that even if GM failed to preserve documents in response to Champion's earliest letters, GM's stated document retention policy of automatically destroying documents after three years means GM should have preserved the data from August 2017 based on the August 2020 letter. (*Id.*)

GM argues it was not under a duty to preserve the ESI because the letters from Champion in 2020 "focus on STMI allocation to other Chevrolet dealers in Nevada, conceded the objectivity of the ADS system, and never mentioned tiers." (ECF No. 59 at 14.) GM argues that Champion's 2020 letters do not mention Champion's allocation tier placement or disparity in tier placement. (*Id.* at 14-15.) GM points to a letter from Champion on December 22, 2020, where Champion's counsel writes that another dealership's sales numbers represent "[a]n impossible sales feat given GM's disciplined inventory allocation system unless massive amounts of STMI units were given to the Las Vegas Market and especially [the other dealership]." (ECF No. 59-3 at 27). Later in the letter, Champion claimed "[GM] had created a distortion and aberration to the RSI in Nevada by giving all the extra STMI inventory to the Las Vegas dealers." (*Id.*)  In a letter from GM to Champion, counsel for GM explained that "[b]ased on the issues raised in

manufacture arguments for the parties."). Additionally, this practice violates the local rules. LR IA 7-3(e) ("References to exhibits or attachments to documents must include citations to the specific page(s) being referenced."). The Court will not parse through 178 pages to make Champion's case for them, and Champion and their counsel should be mindful of this in the future.

that letter and prior correspondence, GM instituted a litigation hold that covered (1) allocation data for Champion Chevrolet and (2) STMI records for all Chevrolet dealers in the Western Region. GM did not believe it was necessary, reasonable or required to institute a litigation hold that covered all allocation data for all Chevrolet dealers in the Western Region." (ECF No. 52-1 at 1.)

GM represents that once tier placement became an issue upon the filing of Champion's Complaint alleging that Champion was not a tier one dealer,[3] GM expanded the litigation hold to cover allocation data for Chevrolet Nevada dealers. (ECF No. 59 at 15-16.) Based on GM's normal document retention policy, GM maintains records for three years. (ECF No. 52-1 at 1 ("Pursuant to its normal document retention policy, GM maintains allocation records for 3 years.").) Thus, GM expanded its litigation hold to include allocation data after September 15, 2022, and records for the previous three years. (ECF No. 59 at 15-16.)

The Committee Notes to the 2015 Amendments to Rule 37(e) direct Courts to "consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." A review of the letters provided by Champion shows that Champion was raising issues with the inventory being provided by GM. In a December 2017 letter, Champion raised issues with the inventory being provided from GM to Champion and focused on Champion's own sales performance. (ECF No. 52-3.) In a letter from August of 2018, Champion again objected to the amount of inventory provided by GM and "the fact that GM offers bigger rebates and incentives of thousands and thousands of dollars more in Las Vegas and California" but not in Reno. (ECF No. 52-4.) However, the exact scope of Champion's issues relating to inventory were not clear, as evidenced in Champion's previously discussed letter from December 2020 where Champion's counsel implies that the Las Vegas Market was being allocated

---

[3] GM disputes this allegation and maintains that Champion is a tier one dealer. (*See, e.g.*, ECF No. 59 at 7 ("Champion has been a Tier 1 dealer since at least 2018." (emphasis removed).)

"massive amounts of STMI units." (ECF No. 59-3 at 27.)

From the Court's review of the correspondence before the complaint was filed, Champion's potential claims seemed to focus on how STMI and other discretionary decisions created inequality. Based on the letters from Champion it is reasonable for GM to have assumed allocation information would not be the basis of potential claims but rather the claims would arise out of GM's discretionary distribution of STMI inventory. Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment ("Often these events provide only limited information about that prospective litigation, however, so that the scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed."); *Micron Technology*, 645 F.3d at 1320.

Additionally, Champion takes issue with the fact that GM retained the Allocation History and Order Management report for Champion but not for any other dealers in the region. (ECF No. 61 at 5.) Champion argues that if GM was not on notice that issues outside of STMI were reasonably foreseeable, it would have allowed for Champion's data to be deleted as well. (*Id.*) However, the Court finds it entirely logical for GM to retain data as to the entity who would be bringing the potential litigation. While the scope of any potential claims brought by Champion may not have been known, the fact that Champion would be the entity bringing the claims was obvious. Additionally, Champion's letters from as early as 2017 focused on Champion's own inventory and sales performance. (*See* ECF No. 52-3.) Thus, a lawsuit relating to Champion's inventory and sales was objectively reasonably foreseeable and the fact that GM preserved Champion's Allocation History and Order Management report has no bearing on whether GM had a duty to preserve reports for all dealerships in Nevada or the Western Region.

Although there is some evidence showing GM may have known the allocation history reports were relevant, the Court finds by a preponderance of the evidence it was not objectively reasonably foreseeable that GM was required to preserve the 2018/2019

1 Reports. *Apple*, 881 F. Supp. 2d at 1132 (citations omitted); *Micron*, 645 F.3d at 1320

2 (mere existence of a potential claim or the distant possibility of litigation is not sufficient

3 to trigger a duty to preserve); *see Compass Bank*, 104 F. Supp. 3d at 1052-53 ("the

4 applicable standard of proof for spoliation in the Ninth Circuit appears to be by a

5 preponderance of the evidence"). Based on the required threshold analysis under Rule

6 37(e), if there is no duty to preserve, then no sanctions are available for spoliation.

7 *Lopez*, No. 2:21-cv-01915-JCM-BNW, 2023 WL 3182658, *2.

8        Based on the above, the Court finds that GM did not have a duty to preserve the

9 ESI at issue with this motion.[4]

10                **2.      Ability to Restore or Replace ESI**

11        However, even if GM had a duty to preserve the ESI at issue and its efforts to

12 preserve the ESI were somehow inadequate, the Court also finds that the ESI at issue

13 could be restored or replaced with other additional discovery. The final criteria that the

14 Court must consider under Rule 37(e) is whether the information which should have

15 been preserved "cannot be restored or replaced through additional discovery." *Lopez*,

16 No. 2:21-cv-01915-JCM-BNW, 2023 WL 3182658, *2. A party must show by competent

17 evidence, which could take the form of expert testimony or other evidence, that the ESI

18 sought was lost. *Colonies*, No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444, at *5

19 (citing *Hugler v. Sw. Fuel Mgmt., Inc.*, No. 16 CV 4547-FMO (AGRx), 2017 WL

20 8941163, at *9 (C.D. Cal. May 2, 2017)). ESI is not irreplaceable if the evidence

21 appears to be largely duplicative of evidence already in the record. *Azevedo v. City of*

22 *Fresno*, No. 1:09–CV–375 AWI DLB, 2010 WL 2353526, *23 (E.D. Cal. June 9,

23 2010) (citing *Medical Laboratory Management Consultants v. American Broadcasting*

24 *Companies, Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) ("The availability of other evidence

25 to Medical Lab to challenge the broadcast's statement regarding the three missing

26 _____

27 [4]        Without a duty to preserve this evidence, GM was not required to take any steps to preserve the ESI under the next criteria under Rule 37(e). Therefore, the Court need

28 not address the second criteria.

slides, and Medical Lab's failure to pursue this evidence, also formed proper bases for the district court's exercise of its discretion").

Champion argues that there is no alternative source for the data about GM's allocation calculations and decisions contained within the 2018/2019 Reports. (ECF No. 52 at 18.) Champion represents that its expert "would have preferred to be able to evaluate the 2018/2019 time period to further expand the scope and further support the notion that Champion should have received more inventory in this time period, but was unable to do so because of GM's spoliation of the [2018/2019 Reports]." (ECF No. 61 at 10.) Champion argues its expert relied on dealer's selling speed, days' supply, and turn rate, which requires an analysis of inventory and sales made, both of which are included in the allocation reports requested. (*Id.* at 9.)

In a declaration by GM's counsel, GM describes the allocation history reports and weekly order placement results as providing "comprehensive information regarding vehicle allocation and show, among other things, the number of vehicles allocated, available days' supply, in-stock inventory, in-system inventory, total estimated vehicle shipments, and units requested or declined by each Nevada Chevrolet dealer." (ECF No. 59-3 at 2.) GM argues it has produced alternative sources of the allocation information covered by the reports. (ECF No. 59 at 18-19.) Specifically, GM produced the following:

- records evidencing all vehicles delivered to and sold by Nevada Chevrolet dealers during this time period, which show the invoice date and delivery date for model year 2016–2024 vehicles delivered to Nevada Chevrolet dealers, which includes the time period January 2018 through October 2019;

- quarterly and annual sales performance reports for all Chevrolet dealers in Nevada for the period from January 2018 through December 2023, and a spreadsheet showing monthly sales by each Chevrolet Nevada dealer since 2017; and

- consolidated operating reports for exclusive Chevrolet dealers in the Western Region, which contain an inventory line item that can be used as a proxy for the 2018/2019 Allocation Records.

(ECF No. 59 at 18-19.)

Based on the other discovery provided by GM, the Court finds that Champion has access to the information which would have been contained in the 2018/2019 Report. (ECF No. 59 at 18-19.) Champion represents its expert needed an analysis of inventory and sales made to compare Champion's performance to other dealers in the state and that that information is included in the allocation records requested, however, Champion does not state whether that information is available from other sources. (ECF No. 61 at 9-10.) This is insufficient to show that the ESI sought was lost or that no duplicative evidence exists in the record. *Colonies*, No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444, at *5 (citation omitted) (party must show by competent evidence, which could take the form of expert testimony or other evidence, that the ESI sought was actually lost) *Azevedo*, No. 1:09–CV–375 AWI DLB, 2010 WL 2353526, *23 (ESI is not irreplaceable if the evidence appears to be largely duplicative of evidence already in the record).

Based on the information GM provided, the data on inventory and sales made by Nevada Chevrolet dealers has been provided by GM. (*See* ECF No. 59 at 18-19.) Thus, the Court finds that regardless of GM's duty to preserve the ESI, the 2018/2019 Reports are not irreplaceable because it appears GM has provided the information which would be contained in the reports through other discovery. *Azevedo*, No. 1:09–CV–375 AWI DLB, 2010 WL 2353526, *23 (citation omitted).

### C.    Availability of Sanctions

Although the Court has determined that GM did not have a duty to preserve the 2018/2019 Reports and that the ESI is replaceable, the Court also finds that, even if all threshold determinations were satisfied in Champion's favor, Champion would not be entitled to sanctions under Rule 37(e). First, under Rule 37(e)(1), if the loss of information has prejudiced the moving party, the district court may order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, under Rule 37(e)(2), where the district court finds that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the district court may

14

require an adverse evidentiary presumption, dismiss the case, or enter default judgment. Fed. R. Civ. P. 37(e)(2).

### 1.    Sanctions Due to Prejudice

Rule 37(e)(1) sanctions require a showing of prejudice to the party seeking the information. Fed. R. Civ. P. 37(e)(1). If the party seeking the information has been prejudiced, the Court may order whatever measures are necessary to cure the prejudice. *Id*. Prejudice exists where "the [spoiling party's] actions impaired [the moving party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)); *see Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 354 (9th Cir. 1995) (finding prejudice when a party's refusal to provide certain documents "forced [plaintiff] to rely on incomplete and spotty evidence" at trial). Determining the prejudice from the loss of the information unavoidably includes an evaluation of the information's importance in the litigation. *Leon*, 464 F.3d at 958. Courts have held that to show prejudice resulting from the spoliation, "a party must only come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 339 (D. Ariz. 2022) (citations omitted). "Courts have the discretion to determine if the spoliation of evidence is prejudicial, and neither party has the burden of establishing or disproving prejudice." *Lopez*, No. 2:21-cv-01915-JCM-BNW, 2023 WL 3182658, at *5 (citations omitted).

Champion argues it "has been forced to rely on incomplete and spotty evidence as a result of GM's failure to produce key evidence for a particular time period, 2018-2019, which is especially relevant and pertinent to the present dispute." (ECF No. 61 at 10.) Champion represents that its expert "would have preferred to be able to evaluate the 2018/2019 time period to further expand the scope and further support the notion that Champion should have received more inventory in this time period but was unable to do so because of GM's spoliation of the [2018/2019 Reports]." (*Id.*) Champion argues

its expert relied on dealer's selling speed, days' supply, and turn rate, which requires an analysis of inventory and sales made, both of which are included in the allocation reports requested. (*Id.* at 9.) Finally, Champion takes issue with GM's expert report which only created composite information as it relates to Champion, not the State of Nevada, because GM measures sales effectiveness on a state-wide basis. (*Id.* at 10.)

GM argues that Champion does not need the 2018/2019 Reports to support their claims or damages methodology. (ECF No. 59 at 22.) GM points out that Champion did not submit a declaration from their expert explaining why he needed the 2018/2019 Reports and that the corresponding reports for 2020-2023 that GM did provide were not part of or necessary to Champion's expert's lost allocation or damages analysis. (*Id.* at n.9.) As discussed above, GM argues it has produced alternative sources of the allocation information covered by the reports. (ECF No. 59 at 18-19.)

Here, there is not enough evidence in the record to show that the absence of the 2018/2019 Reports threatens Champion's ability to go to trial or will interfere with the rightful decision of the case. *Kahaluu Constr.*, 857 F.2d at 604. As discussed above, based on the other discovery provided by GM, the Court finds that Champion has access to the information which would have been contained in the 2018/2019 Report, including inventory and sales made by Nevada Chevrolet dealers. (ECF No. 59 at 18-19.) Additionally, although the burden of establishing or disproving prejudice does not rest on either party, Champion has not "come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been." *Fast*, 340 F.R.D. at 339 (citations omitted).

Consequently, the Court finds that a preponderance of the evidence shows, even if the threshold factors supported a finding of spoliation, sanctions are not available because Champion was not prejudiced by any failure to preserve because GM provided discovery which contains the same information. *Kahaluu Constr.*, 857 F.2d at 604; *see Compass Bank*, 104 F. Supp. 3d at 1052-53 ("the applicable standard of proof for spoliation in the Ninth Circuit appears to be by a preponderance of the evidence").

1

**2.     Sanctions Due to Intent to Deprive**

2        Finally, even assuming Champion was not prejudiced by GM's actions, the Court

3    also finds that Champion is not entitled to sanctions under Rule 37(e)(2) because there

4    is insufficient evidence to find that GM "acted with the intent to deprive [Champion] of

5    the information's use." Fed. R. Civ. P. 37(e)(2). Rule 37(e) does not define "intent," but

6    in context, the word is most naturally understood as involving the willful destruction of

7    evidence with the purpose of avoiding its discovery by an adverse party. *Jones*, 95

8    F.4th at 735 (citing *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312

9    (11th Cir. 2023); Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment);

10   *see Dish Network L.L.C. v. Jadoo TV, Inc.*, No. 20-CV-01891-CRB (LB), 2022 WL

11   11270394, at *3 (N.D. Cal. Oct. 19, 2022) ("For purposes of Rule 37(e)(2), 'intent' ...

12   means the evidence shows, or it is reasonable to infer, that a party purposefully

13   destroyed evidence to avoid its litigation obligations.") (citation omitted). Although direct

14   evidence of such intent is always preferred, a court can find such intent from

15   circumstantial evidence. *Fast*, 340 F.R.D. at 339 (citing *Auer v. City of Minot*, 896 F.3d

16   854, 858 (8th Cir. 2018) (intent required by Rule 37(e)(2) "can be proved indirectly")).

17        Champion argues "there is circumstantial evidence pointing to the fact that GM

18   intended to deprive Champion of the use of the [2018/2019 Reports]." (ECF No. 52 at

19   20.) Champion argues that because GM preserved STMI data from 2015 onward, "GM

20   displayed that there was no extra burden placed on them by issuing a stop on the

21   [2018/2019 Report's] deletion." (*Id.*) GM maintains it did not preserve the 2018/2019

22   Report because it "did not believe it was necessary, reasonable or required to institute a

23   litigation hold that covered all allocation data for all Chevrolet dealers in the Western

24   Region." (ECF No. 52-1 at 1.)

25        Here, the Court's review of the circumstantial evidence shows a judgement call

26   was made to limit the scope of the litigation hold based on GM's perception that the

27   additional information was not necessary and the extra amount of effort which would be

28   needed to maintain all allocation records and communication involving Western Region

1   dealers. (ECF No. 59 at 10 ("If GM implemented the litigation hold Champion requested

2   over all allocation records and communications involving Western Region dealers,

3   approximately 110 GM custodians would have been subject to that litigation hold,

4   including approximately 60–70 employees in GM's order fulfillment department, which

5   handles allocation of new motor vehicles to dealers, and 35–40 employees within the

6   sales organization of the Western Region Chevrolet team.").) For the sake of argument,

7   even if GM decided not to include the allocation data only because of the burden it

8   would place on its employees, that still does not meet the standard of destroying

9   evidence with the purpose of avoiding its discovery by an adverse party. *Jones*, 95

10  F.4th at 735 (citations omitted).

11      Thus, based on the representations made by GM for the reason they did not

12  preserve the evidence, the Court does not find evidence of intent to destroy the

13  2018/2019 Reports to deprive Champion of the ESI and Champion is not entitled to

14  sanctions under Rule 37(e)(2). Therefore, even if GM was under a duty to preserve the

15  2018/2019 Reports (which the Court found it did not), Champion would not be entitled to

16  sanctions under either Rule 37(e)(1) or (2).

17      For all the foregoing reasons, Champions motion for sanctions, (ECF No. 52), is

18  denied because GM did not have a duty to preserve the reports, the information in the

19  reports can be replaced, Champion is not prejudiced by the loss of the reports, and GM

20  did not intentionally destroy the reports to deprive Champion of the ESI.

21  **III.   DISCUSSION – MOTIONS TO SEAL**

22      **A.   Legal Standard**

23      "The courts of this country recognize a general right to inspect and copy public

24  records and documents, including judicial records and documents." *Courthouse News*

25  *Serv. v. Planet*, 947 F.3d 581, 591 (9th Cir. 2020) (quoting *Courthouse News Serv. v.*

26  *Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018)). Certain documents are exceptions to this

27  right and are generally kept secret for policy reasons, including grand jury transcripts

28  and warrant materials in a pre-indictment investigation. *Kamakana v. City & Cnty. of*

1    *Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

2        If a party seeks to file a document under seal, there are two possible standards

3    the party must address: the compelling reasons standard or the good cause standard.

4    *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016).

5    The choice between the two standards depends on whether the documents proposed

6    for sealing accompany a motion that is "more than tangentially related" to the merits of

7    the case. *Id*. at 1099. If it is more than tangentially related, the compelling reasons

8    standard applies. If not, the good cause standard applies. *Id*. at 1102.

9        Despite the strong preference for public access, there is an exception for sealed

10   materials attached to a discovery motion unrelated to the merits of a case. *See Phillips*

11   *ex rel. Estates of Byrd v. Gen. Motors Corp.,* 307 F.3d 1206, 1213–14 (9th

12   Cir.2002). Under this exception, a party need only satisfy the less exacting "good cause"

13   standard. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir.2003).

14   The "good cause" language comes from Rule 26(c)(1), which governs the issuance of

15   protective orders in the discovery process: "The court may, for good cause, issue an

16   order to protect a party or person from annoyance, embarrassment, oppression, or

17   undue burden or expense...." Fed. R. Civ. P. 26(c). "Applying a strong presumption of

18   access to documents a court has already decided should be shielded from the public

19   would surely undermine, and possibly eviscerate, the broad power of the district court to

20   fashion protective orders," and thereby undermine Rule 26(c). *Phillips,* 307 F.3d at

21   1213; *see also Seattle Times Co. v. Rinehart,* 467 U.S. 20, 33 (1984) (explaining that

22   discovery is largely "conducted in private as a matter of modern practice," so the public

23   is not presumed to have a right of access to it).

24       **B.    Discussion**

25       Accompanying the motion for sanctions are two motions to seal exhibits. (ECF

26   Nos. 53, 60.) The first motion to seal is by Champion and concerns exhibits which are

27   covered by the parties' protective order, (ECF No. 29). (ECF No. 53.) Champion argues

28   its motion for sanctions is nondispositive because it pertains "to *conduct* of GM as it

relates to preservation procedures of Federal Rules of Civil Procedure **not** to the outcome of the litigation under the Nevada Dealer Act." (*Id.* at 4-5.) Champion also argues the exhibits contain sensitive information concerning GM's proprietary business practices and other matters relating to GM's relationships with its dealers and therefore the documents should be sealed to "protect GM from harassment, undue burden, or oppression or expense." (*Id.* at 5.) Turning to GM's motion to seal, GM also seeks to seal documents that were produced pursuant to the parties' Protective Order. (ECF No. 60.) As with Champion, GM also argues that the underlying motion for sanctions is a nondispositive motion. (*Id.* at 4.)

Here, the Court finds that the items that are requested to be sealed are generally related to items that have been disclosed during discovery and are not related directly to dispositive issues central to this case.  Therefore, the Court finds that the "good cause" standard applies to the motions to seal. The Court has reviewed each item that either Champion or GM seek to seal or redact from public view. Based on this review, the Court finds that each of the items that is requested to be sealed or redacted contains sensitive trade secrets, source code, and/or confidential financial information that is proprietary and the disclosure of such information would be harmful to the parties. Balancing the need for the public's access to information requested against the need to maintain the confidentiality of this information, the Court finds that good cause exists to seal the information requested by both parties in this case. This is further strengthened by the fact that the Court has already granted a protective order over this material. *Phillips,* 307 F.3d at 1213.

///

///

///

///

///

///

IV.     **CONCLUSION**

**IT IS THEREFORE ORDERD** that Champion's motion for sanctions, (ECF No.
52), is **DENIED**.

**IT IS FURTHER ORDERED** that the motions to seal, (ECF Nos. 53, 60), are
**GRANTED**.

**DATED**:   June 24, 2024   .

**UNITED STATES MAGISTRATE JUDGE**